# THE IBERIA.[1]

# THE UMBRIA.

FABRE *v.* CUNARD S. S. Co., Limited. DOLLARD *v.* SAME *et al.* HEM-ISPHERE INS. Co. *v.* SAME. NORD-DEUTSCHE INS. Co. *v.* THE UMBRIA *et al.* ARNOLD *et al. v.* SAME. COATES *v.* SAME. SWITZERLAND MA-RINE INS. Co. *v.* SAME. BRITISH & FOREIGN MARINE INS. Co. *v.* SAME. TRANSATLANTIC MARINE INS. Co. *v.* SAME.

*(District Court, E. D. New York. January 9, 1890.)*

1. **COLLISION—FOG—WHISTLE AHEAD—GOING FULL SPEED.**
It is a fault for the master of a vessel in a fog, on the high sea, who has slowed his vessel on hearing a whistle ahead, to afterwards ring for full speed ahead, on the supposition that the danger is past, and before the position and course of the other vessel are known.

2. **SAME—BELIEF OF FUTURE DANGER.**
A violation of article 13 of the international collision rules, by going full speed in a fog, requires, to excuse it, the existence of a present danger, and a necessity to go at full speed to avoid it; and a belief on the part of the master of such vessel that a danger may in a certain event arise in the future, to avoid which he gives the full-speed order, is not the excuse permitted by article 23.

3. **SAME—FACTS IN SUIT.**
The steam-ship Umbria had left the port of New York on one of her regular voyages to Liverpool, and had laid an easterly course along the Long island shore, and was running at a speed of not less than 16 knots. A dense fog prevailed at the time. She had overtaken the steam-ship Normandie, and had left her astern on her starboard quarter so far as not to hear the Normandie's whistle. A faint whistle was heard ahead on the starboard bow of the Umbria, and then another whistle on the same bow, but more ahead than the first. The engine of the Umbria was slowed. Again the whistle was heard, and then the engine of the Umbria was put full speed ahead, her master supposing by the sound that the approaching vessel was clear of his course; or, as the official log stated, thinking that the approaching vessel would port for the Normandie, he ordered full speed ahead, to pass her. Shortly afterwards, nearly dead ahead, and on a course crossing that of the Umbria, appeared the steam-ship Iberia. The Umbria's wheel was put hard a-port, and her engines reversed, notwithstanding which she struck the Iberia on her port quarter, cutting her in two. The place of collision was several miles off Long Beach, on the Long Island coast, and some 12 miles east of the entrance to New York harbor. *Held,* that the cause of the collision was the erroneous order of the master of the Umbria to put that vessel at full speed in a fog, before the position and course of the vessel whose whistle had been heard were known.

4. **SAME.**
The French steam-ship Iberia, bound to the port of New York from the Persian gulf, was approaching the coast in a fog, steering W. N. W. for the Long Island coast, making about 3½ or 4 knots an hour, sounding as she went and blowing a fog whistle. The whistle of the Umbria was heard a little on the port bow, some minutes before the collision which subsequently ensued. The course of the Iberia was thereupon changed to N. W., and she kept on blowing her whistle, in response to the Umbria's whistle, till the Umbria was seen through the fog near at hand, and heading for the Iberia's beam. The latter's engines were at once put full speed ahead, but she was struck by the Umbria and sunk. *Held,* that the porting of the Iberia was not a fault, and did not contribute to the collision.

5. **SAME—APPROACHING NEW YORK HARBOR—CROSSING TRACK OF OUTGOING VESSELS.**
There is no rule which forbids a vessel bound for New York harbor to approach the coast on a course crossing the track of vessels bound eastward from the port of New York.

6. **SAME—OPINION EVIDENCE.**
The opinion of experts, however intelligent and trustworthy, does not bind the conscience of the court.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

In Admiralty.

Action for damage by collision. The suit of Fabre against the Cunard Steam-Ship Company was to recover the value of the Iberia. The other suits were by insurers of cargo lost with the Iberia.

R. D. Benedict, for Cyprien Fabre and Nord-Deutsche Ins. Co.

Hand & Bonney, for Arnold and Coates.

John McDonald, for Dollard.

Butler, Stillman & Hubbard, for Switzerland Marine Ins. Co., British & Foreign Marine Ins. Co., Hemisphere Ins. Co., and Transatlantic Marine Ins. Co., et al.

Owen, Gray & Sturges, for Cunard S. S. Co., owner of the Umbria.

BENEDICT, J. These actions arose from a collision that occurred on the 10th day of November, 1888, between the steam-ship Umbria and the steam-ship Iberia, on the high seas, and present for determination the question whether that collision was caused by the fault of the Umbria or the fault of the Iberia, or by fault of both those vessels. The collision took place a little after 1 o'clock P. M., in a dense fog. The Umbria, a first-class steam-ship of 2,450 tons net register, and capable of making an average speed of 19½ knots an hour from New York to Liverpool, at half past 12 of the day in question, discharged her pilot at the outer buoy, and took an easterly course on her homeward trip from New York. The fog was dense, lifting at intervals. While the Umbria was proceeding in this fog at a rate of speed certainly not less than 16 knots an hour, a faint whistle was heard on her starboard bow. Then another whistle was heard on the same bow, but more ahead than the first. Then her engine was put slow. Again the whistle was heard, and then the engine was put full speed ahead. Shortly afterwards the Iberia appeared, crossing the course of the Umbria, nearly dead ahead of her, and but 800 or 900 feet away. The engines of the Umbria were at once reversed, but it was impossible to stop her in time, and she struck the Iberia on the port quarter, cutting her in two pieces, and causing her total loss. The Iberia was a steam-ship of 1,059 tons burden, bound from the Mediterranean to the port of New York. She had been in a dense fog since 8 o'clock in the morning, and was running with her engines at "easy," the lowest order short of stopping, having a speed of from 3½ to 4 knots an hour, on a W. N. W. course, sounding with the lead as she went. While so proceeding, the whistle of the Umbria was heard by her on her port bow. Her course was then altered two points to the northward, her engines still kept at "easy," and the fog signal blown from time to time, together with a short blast to indicate porting. The Umbria, when she appeared in the fog, was close to the Iberia, and heading directly for her port side. The engine of the Iberia was at once put full speed ahead, but, as already said, it was too late to avoid collision.

I think it may be fairly concluded that this collision would not have occurred had not the engines of the Umbria been put at full speed ahead after the whistle of the Iberia had been heard, and before she was seen.

No doubt the rate of speed at which the Umbria was running when the order to slow was given increased the momentum of the vessel, and aggravated the effect of the order "full speed ahead," when it was given, in this way conducing to the collision; but I think it may be taken for true that, if the engines of the Umbria had not been put at full speed just before the Iberia was seen, collision would have been avoided. I make my decision, therefore, to turn upon the question whether the order "full speed ahead" was a lawful order. In regard to the circumstances under which this order was given, two different statements have been made by witnesses called in behalf of the Umbria. On the main bridge of the Umbria at the time were the master, directing the navigation of his vessel, the second officer, and the extra third officer. The chief officer also came on the bridge, as the whistle was reported. The testimony of the chief officer is that the whistle was reported as he came on the bridge, when the master ordered the engines put "slow;" that in about a minute he heard the whistle; that the captain then ordered the engines put full speed ahead, saying, at the time, "She is well off, and we can go past her." The second officer says that the whistle was heard by him two points or more on the starboard bow; that the master then gave the order to slow the engine; that the whistle was again heard, still more ahead; that the captain then said, "She was well clear of our track, and to let her go full speed past her," and such order was given. The extra third officer was at the telegraph, and testifies to the order "slow," and the order "full speed ahead," and to having heard one whistle.

The testimony of these witnesses condemns the Umbria, for, according to their evidence, the Umbria, in defiance of the navigation rules, (article 13,) which required her to go at moderate speed, went at full speed, not in order to lessen or remove danger of collision, but because the master supposed there was no danger of collision. The illegality of the order is not affected by the fact that when the master of the Umbria, in violation of law, put his vessel at full speed in a dense fog, he was aware that in the fog somewhere ahead there was a vessel, conjectured by him to be on a course opposite his own. "Those in charge of a ship, in such a dense fog. * * * should never conjecture anything when they hear a whistle in such close proximity." *The Kirby Hall*, 8 Prob. Div. 71. And if it be true, as the officers of the Umbria seem to say, that the master of the Umbria put his vessel full speed ahead in a fog to pass an approaching vessel, whose whistles at the time were giving information that she was on a course crossing his own, the navigation of the Umbria was not only illegal, but reckless. Another account, somewhat different from that given by the first and second officers, is given in behalf of the Umbria. This account appears in the official log of the Umbria, in the following statement: "Hearing the whistle about three points on the starboard bow, and thinking he would port for the French steamer on our starboard quarter, ordered full speed ahead, to pass her." This log was written by the purser of the Umbria, who was not on deck at the time of the collision. He testifies that the mention in the official log of the master's thoughts at the time when he put the

Umbria at full speed was made without suggestion from the master, and because such was the common talk about the ship. According to the purser, the master first knew of the entry in the log when shown to him after it was made up, and then approved it. In the answer this account does not appear. The answer gives the reason for the order full speed ahead that the sound of the Iberia's whistle "indicated that she was well clear of the Umbria." When upon the stand as a witness the master gave the same reason for the order to put the Umbria at full speed as that stated in the official log, although I observe that in some places in his testimony he seems to agree with the other officers on the bridge; as, for instance, when he says: "I gave the order to slow. Then, thinking the whistle to be such a distance off, I gave the order of full speed to pass her, thinking she was going in the opposite direction."

The fact being that the French steamer, which was the Normandie, had been passed by the Umbria, and had not been seen nor heard for some time when the Iberia's whistle was heard, and that no one on the Umbria but the master appears to consider the Normandie as a feature in the collision, the entry in the official log has given opportunity for the argument that the reason there stated for going at full speed was an after-thought. Whether such be the origin of the excuse stated in the official log I find it unnecessary to decide, for the reason that, in my opinion, the reason stated in the official log for putting the vessel at full speed is not a legal excuse. Confessedly, the Umbria was put at full speed in a dense fog, in violation of article 13. The burden is therefore on the Umbria to show legal excuse for the order full speed. What is a legal excuse for such an order is stated in article 23, namely, the existence of an immediate danger, and a necessity to go at full speed in order to avoid it. But the excuse put forth in the official log, and by the master on the stand, is not the presence of an immediate danger, but the master's belief that a danger would arise in the future in case the Iberia should port to avoid the Normandie. This is not the excuse permitted by article 23. There must be a present danger and an apparent necessity to go at full speed in order to avoid that danger. The facts proved in this case to have been before the master of the Umbria at the time when he put his vessel at full speed do not disclose a present danger, nor justify a belief that the Iberia was about to port for the Normandie, nor show that the only course open to avoid the Iberia was to go full speed ahead. The master of the Umbria, when he heard the whistle of the Iberia, knew that the Umbria was in advance of the Normandie; that the Normandie had been neither seen nor heard for some time; and that the Umbria's whistle had been blowing continuously. In these facts there was nothing to justify the belief that the approaching vessel would disregard the Umbria, whose presence was made known by her whistles, and would change her course to avoid the Normandie, whose presence, so far as appeared, was unknown. If, then, the assumption by the master of the Umbria that the approaching vessel was bound on a course opposite to his own was justified, it still remains true that his excuse for going at full speed is nothing more than an unfounded apprehension that, in a certain con-

tingency, danger might arise. No justification for going at full speed in a fog is afforded by such a state of facts.

But the assumption of the master of the Umbria that the approaching vessel was on a course opposite to his own was unjustifiable. His ground for this assumption he states to be that in the course of his large experience he had never seen a vessel on a northerly course in this locality, in clear weather. This qualification, which appears more than once in his testimony, is suggestive, and points to the inference that the master knew that in this locality a vessel might be sailing northward in a fog. The case contains proof that for a steamer bound for New York, coming upon the coast from the south-east in a fog, the proper course is to steer W. N. W. for the coast, till she gets into 8 or 10 fathoms of water. The master's assumption that the passing vessel was sailing to the west—upon which assumption he confesses to have acted when he put his vessel at full speed—was therefore unfounded, and his excuse for disobeying article 13, of course, falls with it. No doubt the chances were in favor of the approaching vessel being bound west, but article 13 is not to be disobeyed on the chance that no ill will result. Instead of putting his vessel at full speed, what the master of the Umbria should have done was to stop until he was able to move on something more than the chance that the approaching vessel was sailing on a course opposite to his own. "In a dense fog," says the court in *The Kirby Hall*, already cited, "those on board the Kirby Hall were bound not to speculate, but to bring their vessel to a standstill on the water at once." "Under such circumstances, she had no right to act upon conjecture." WALLACE, J., *The City of New York*, 35 Fed. Rep. 604.

But two experts of character and intelligence have been called in behalf of the Umbria, who, it is claimed, testify that to put the Umbria at full speed, under the circumstances, was a proper maneuver; and, because no expert has been called to the contrary, it has been earnestly contended in behalf of the Umbria that it is an established fact in the cause that it was proper to put the Umbria at full speed, under the circumstances, and that all there is for the court to do is to say so. This contention seems to render it necessary to repeat here that the opinions of experts, however intelligent and trustworthy, do not bind the conscience of the court. Moreover, what the experts called in behalf of the Umbria say is, first, that the master of the Umbria was justified in assuming that the Iberia was sailing west. Upon this point, however, the case contains other testimony which justifies a different conclusion, and, if it be a question of nautical skill or science, which is doubted, the weight of the evidence upon this point is not with the experts called on behalf of the Umbria. The second conclusion of these experts is that, inasmuch as Capt. McMicken assumed that the Iberia was sailing west, his order to go full speed was proper, because he believed that a position of danger to the Umbria might arise in case the Iberia should port for the Normandic. I marvel to hear it contended that the law can be thus sworn away. No; the law still stands that a vessel called to answer for damages shown to have arisen from her going full speed in a fog must be held liable, unless

.facts be proved which show to the court the existence of at least an apparent necessity to go at full speed to avoid some immediate danger. Judged by the law, the Umbria must be condemned.

Turning, now, to the Iberia, it remains to determine whether she also was guilty of fault that conduced to the collision. One fault charged against the Iberia, and strenuously insisted upon, is that she was on a course across the track of vessels leaving New York bound to the eastward. Cases are cited in support of this contention, which, however, are mostly, if not all, cases of river and harbor navigation. It is not proved here, and of course cannot be proved, that in the locality of this collision no course is proper except an east or west course. No statute nor rule nor custom proved forbids a vessel to cross the track of vessels leaving New York bound to the eastward. The Iberia was in a fog. She was sailing towards the Long island coast, sounding with her lead, and she had not yet reached .10 fathoms of water. Pilots called in this case declare such a course to be proper for her, under the circumstances, and that is my opinion.

Another fault charged on the Iberia is that she ported after hearing the Umbria's whistle, and before the Umbria was seen. Such action, under very similar circumstances, has been approved by courts. *The Frankland,* 1 Asp. 489; *The Lepanto,* 21 Fed. Rep. 655; *The Haskell,* (court of appeal, Eng. July 8, 1889.) As a matter of fact, the porting of the Iberia gave the Umbria more time to avoid her, which was what the Umbria needed, and I am unable to see that it in any way conduced·to the collision.

Another charge against the Iberia is that she kept no proper lookout. But the Umbria's whistle was heard in due time, and the Umbria herself was seen as soon as possible. Want of lookout was no cause of this collision. Again, it is charged on the Iberia that her whistle was insufficient. As to this, all that is necessary to be said is that the proof shows that her whistle was sufficient to warn the Umbria at the distance of a mile, and to indicate to the officers on the Umbria that she was distant a mile on a course crossing the course of the Umbria. ·These are all the faults charged upon the Iberia that seem to deserve particular attention. So far as I am able to discover from a laborious examination of the testimony, the Iberia was guilty of no fault which conduced to the collision. My conclusion, therefore, is that the Umbria alone is liable for the damages caused by the collision in question. Let decrees to that effect be entered in the several causes.